# COURT OF APPEALS
# DECISION
# DATED AND FILED

## April 6, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP136**

STATE OF WISCONSIN

Cir. Ct. No. **2018TP179**

IN COURT OF APPEALS
DISTRICT I

IN THE INTEREST OF D.D.S., A PERSON UNDER THE AGE OF 18:

STATE OF WISCONSIN,

      PETITIONER-RESPONDENT,

   V.

V. S.,

      RESPONDENT-APPELLANT.

---

APPEAL from an order of the circuit court for Milwaukee County: GWENDOLYN G. CONNOLLY, Judge. *Affirmed.*

¶1 DUGAN, J.[1] V.S. appeals the order of the circuit court terminating his parental rights to his son, D.D.S., and argues that the circuit court erroneously

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2019-20).

(continued)

exercised its discretion following the dispositional phase when it found that it was in D.D.S.'s best interests to terminate V.S.'s parental rights. This court disagrees and affirms the circuit court's order terminating V.S.'s parental rights to D.D.S.

## BACKGROUND

¶2 D.D.S. was born on December 30, 2009, to C.P. and V.S. D.D.S. was born prematurely, with a hole in his heart, weighed approximately 1.3 pounds, and spent the first five to six months of his life in the neonatal intensive care unit (NICU).

¶3 D.D.S. originally lived with C.P., his mother, but he was removed from C.P.'s care on August 5, 2015, after C.P. admitted to using "belt whoppings" as a means of discipline. D.D.S. was eventually returned to his mother's care two years later in August 2017, but was again returned to the care of his foster family in November 2017, after allegations that C.P. punched D.D.S. in the face. At the time D.D.S. was removed from C.P.'s care, D.D.S. was approximately eight years old, and he was experiencing severe developmental delays and could not yet perform tasks such as tying his own shoes, dressing himself, using a zipper, or brushing his teeth. He also suffered from several health issues, including breathing problems, lead poisoning, and severe dental issues where his mouth was described as being "almost silver" because of the number of fillings and caps he had.

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

¶4     When he was not in foster placement, D.D.S. primarily lived with C.P., and V.S. was allowed visitation with D.D.S., either supervised or unsupervised.  V.S.'s visits have been suspended twice.  Visits were first suspended in April 2017, after an allegation that V.S. hit D.D.S. in the face, and they did not resume again until January 2018.  Visits were then suspended a second time in October 2019, after V.S. showed D.D.S., who was then approximately ten years old and cognitively approximately five years old, a "Scared Straight" video to explain to D.D.S. that D.D.S. would end up in prison if he did not behave himself.[2]  Visits between V.S. and D.D.S. never resumed after this incident.

¶5     The State filed a petition to terminate V.S.'s parental rights on August 1, 2018, on the grounds that D.D.S. was a child in need of protection or services and V.S. failed to assume parental responsibility.[3]  V.S. entered a no-contest plea on the grounds that D.D.S. was a child in need of protection or services.  In support of the grounds, the case manager testified to V.S.'s continued drug and alcohol abuse, V.S.'s failure to engage in the parenting classes and other services provided to help him move forward towards reunification with D.D.S., and V.S.'s inconsistent role in D.D.S.'s life.

---

[2] Scared Straight is a program wherein a minor learns about and experiences prison life as a deterrent for engaging in unlawful behavior.

[3] The petition also addressed termination of the rights of D.D.S.'s mother, C.P., but her rights are not a part of this appeal.

¶6    The disposition hearing took place over the course of three days[4] at which the circuit court took testimony from V.S.'s therapist, V.S.'s mother, D.D.S.'s therapist, and D.D.S.'s case manager.[5]

¶7    V.S.'s therapist testified that he had been working with V.S. since V.S. was about thirteen or fourteen years old, when V.S. himself was in the "child welfare system." He testified that he has watched V.S. be "very dedicated and wanting to be a good father" and he detailed the challenges that V.S. has faced in controlling his own mental health to be able to be a father to D.D.S. The therapist testified that, in his opinion, terminating V.S.'s rights "would be a detriment to [V.S.'s] own psychological well-being and eventually, I think, to the son as well."

¶8    In recounting observations of V.S. and D.D.S., V.S.'s therapist testified that he had most recently had the opportunity to observe visits between V.S. and D.D.S. once in April or May and another time in July 2019. However, he also testified that V.S. and D.D.S.'s case manager provided him with information about D.D.S. and the abuse and traumas D.D.S. has suffered, including reports on D.D.S. and pictures of D.D.S.'s scars from the abuse by C.P. that were shared with him. He further testified that, over the course of treating V.S., he had come to witness that V.S. has a "very strong" bond with D.D.S. and, acknowledging that he was testifying in "children's court," which considers the best interests of the

---

[4] The hearings were held on December 17, 2019, and August 6 and 7, 2020. The delay in the hearing dates resulted from the COVID-19 pandemic and court protocols adopted in response to the pandemic.

[5] The TPR proceedings here also included D.D.S.'s siblings, and testimony was taken at these hearings in connection with their cases. As that testimony is not relevant to D.D.S., this court only discusses the testimony taken in relation to D.D.S.

child, the therapist testified that the relationship between V.S. and D.D.S. should continue because it was in the best interests of the father and son.

¶9    When V.S.'s therapist was called to testify at the second hearing, he addressed any progress that V.S. had made towards the goal of reunification.  The therapist testified that visits between V.S. and D.D.S. were still suspended and that had taken a toll on V.S., but he testified that he was working with V.S. on taking steps to begin the recommended therapeutic visits between V.S. and D.D.S.  The therapist further testified, though, that the therapeutic visits had not yet begun because V.S. did not trust D.D.S.'s therapist and was unwilling to engage with her. When questioned by the circuit court about the amount of time that V.S. would need to engage in the therapeutic visits, V.S.'s therapist testified that it would "take a lot" for V.S. to establish a trusting relationship and that, once V.S. was willing to move forward with the therapeutic visits, it might take four to six weeks for V.S. to start establishing the trust necessary for a productive relationship.

¶10    V.S.'s mother testified that she remembers visiting D.D.S. in the NICU and she remembers that V.S. was excited to have a son.  She further testified that she and V.S. were involved in caring for D.D.S. in the beginning, even though D.D.S. lived with C.P.  However, she also testified that it has been over three years since she has had regular visits with D.D.S. and the last time she saw him was almost a year ago in October 2019.  She testified, though, that she loved D.D.S., D.D.S. loved her, and V.S. and D.D.S. loved each other.

¶11    In contrast, D.D.S.'s therapist and caseworker testified that it was in D.D.S.'s best interests to terminate V.S.'s parental rights.  More specifically, D.D.S.'s therapist testified that she has never met or talked to V.S., even though she had worked with D.D.S. on a regular basis for some time.  She further testified

that D.D.S. identifies his foster father as the one who keeps him safe and that D.D.S. is "highly frightened" of V.S. and "presents with high anxiety" when the subject of V.S. comes up. She further testified that D.D.S. "consistently states that he does not want to see [V.S.]" and that D.D.S. has become physically aggressive and disruptive to the point where D.D.S. "will use every curse word in the book," say "he was going to go out and get drunk," and he will "bounce[] all over the place" in an effort to express his feelings about a visit with V.S. D.D.S.'s therapist also testified that D.D.S. has never spoken about his grandmother. When asked if it would be in D.D.S.'s best interests to terminate V.S.'s parental rights, she testified, "I do believe that there would be more benefit to [D.D.S.] emotionally and psychologically to termination than there would be to maintaining."

¶12    D.D.S.'s case manager testified that D.D.S. does not currently have an adoptive resource; however, D.D.S. is thriving in his current foster placement, and his foster family has expressed a commitment to keep D.D.S. at their home until an adoptive resource is located. She further testified that D.D.S. suffered from a host of medical, behavioral, and developmental issues at the time she first became involved with D.D.S.'s case about five years ago, but she testified that D.D.S. has made significant strides since the time D.D.S. was removed from the parental home and placed with his foster family. She then testified that there was no "significant emotional bond" with V.S. and V.S. does not engage with D.D.S.'s foster family in learning about D.D.S.'s daily activities. She also testified that D.D.S. had a relationship with his paternal grandmother, but that "he has not had consistent contact with her in quite some time" and she "has not reached out … to try to set up visitations with [D.D.S.] or ask how he is doing or try to maintain that relationship" in years. Thus, it was the case manager's opinion that D.D.S. would suffer no harm if his relationships with V.S. and his grandmother were severed.

She also testified that, even though this case had been continuing for five years, D.D.S. was not "anywhere close to being reunified" with V.S.

¶13    At the conclusion of the hearings, the circuit court found that it was in D.D.S.'s best interests to terminate V.S.'s parental rights. In so doing, the circuit court considered the factors enumerated in WIS. STAT. § 48.426(3) and made findings specific to each factor.[6]

¶14    As it relates to the first factor, the circuit court found that "it is not appropriate or proper to find that [D.D.S.] is highly adoptable or a highly

---

[6] WISCONSIN STAT. § 48.426(3) provides:

> (3) FACTORS. In considering the best interests of the child under this section the court shall consider but not be limited to the following:
>
> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.
>
> (e) The duration of the separation of the parent from the child.
>
> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

adoptable child" because of his age and specific needs and, therefore, the first factor "weighs against termination of parental rights for [D.D.S.]"

¶15    Addressing the second factor, the circuit court found that the improvement in D.D.S.'s overall health and well being from the time D.D.S. was removed from the parental home weighed in favor of terminating parental rights. The circuit court recognized that D.D.S. has received occupational therapy, speech therapy, and special education to address some of the delays and other developmental issues D.D.S. faced when he was removed from C.P.'s home and has made improvements in the areas in which D.D.S. was developmentally behind. The circuit court also noted that the testimony demonstrated that D.D.S. had made significant strides in his development and was now able to do certain tasks, such as dress himself that he could not do before.

¶16    In considering the third factor, the circuit court recognized that V.S.'s therapist testified that V.S. and D.D.S. had a "substantial relationship" with an "intimate bond."   However, the circuit court placed less weight on the testimony based on the fact that V.S.'s therapist "provided no information that would inform this belief" and was "unable to provide any basis for what he actually knows" when questioned on cross-examination.   The circuit court also dismissed any relationship D.D.S. has with his paternal grandmother because, although D.D.S. "does know" his grandmother, "he hasn't had contact with her for a great deal of time, indeed years ago as the testimony came out."   On the other hand, the circuit court found it important that D.D.S.'s therapist and case manager, who have regular and recent contact with D.D.S., testified that D.D.S. was "highly frightened" of his father.   This factor, therefore, weighed in favor of terminating parental rights.

¶17 Because of D.D.S.'s cognitive delays which impacted his ability to comprehend the subject matter, the circuit court did not find that D.D.S.'s wishes and expressions of liking his placement with his foster family weighed for or against terminating parental rights under the fourth factor. However, the circuit court found that, "on the main," D.D.S. had been separated from his parents for the last five years and V.S.'s inconsistent engagement in D.D.S.'s life is demonstrated by V.S.'s lack of understanding of D.D.S.'s specific needs that ended up causing D.D.S. to fear him. Therefore, the fifth factor weighed in favor of terminating parental rights.

¶18 In considering stability for D.D.S. under the last factor, the court recognized that D.D.S.'s current foster placement was not an adoptive resource, but his foster family had provided D.D.S. with safety and stability and was willing to continue to do so until the time that an adoptive resource was located. The circuit court also considered the likelihood of D.D.S. finding safety and stability if parental rights were not terminated, and the circuit court found that it has been five years and, despite the numerous services provided, V.S. was still unable to provide a safe and stable home environment for D.D.S. Thus, this factor weighed in favor of terminating parental rights, even if D.D.S.'s foster placement was not an adoptive resource.

## DISCUSSION

¶19 "Wisconsin has a two-part statutory procedure for the involuntary termination of parental rights." *Steven V. v. Kelley H.*, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856. In the first phase, called the "grounds" phase, "the petitioner must prove by clear and convincing evidence" that at least one of the twelve grounds enumerated in WIS. STAT. § 48.415 exists. *Steven V.*, 271

Wis. 2d 1, ¶¶24-25; *see also* WIS. STAT. § 48.31(1). In the second phase, often referred to as the "dispositional phase," the court must decide if it is in the child's best interest that "the parent's rights be permanently extinguished." *Steven V.*, 271 Wis. 2d 1, ¶¶26-27; *see also* WIS. STAT. § 48.426(2).

¶20     "At the dispositional hearing, the court must consider any agency report submitted and the six factors enumerated in [WIS. STAT.] § 48.426(3) in determining the best interests of the child." *Sheboygan Cnty. DHHS v. Julie A.B.*, 2002 WI 95, ¶4, 255 Wis. 2d 170, 648 N.W.2d 402. "The court may also consider other factors, including factors favorable to the parent; but all factors relied upon must be calibrated to the prevailing standard: the best interests of the child." *Id.*

¶21     This court will uphold the circuit court's decision to terminate parental rights "if there is a proper exercise of discretion." *State v. Margaret H.*, 2000 WI 42, ¶32, 234 Wis. 2d 606, 610 N.W.2d 475. "A proper exercise of discretion requires the circuit court to apply the correct standard of law to the facts at hand." *Id.* In making its determination, "the best interests of the child is the paramount consideration" for the circuit court. *Id.*, ¶33. Giving "paramount consideration" to a parent or other family member is a "[f]ailure to apply the appropriate legal standard" and "constitutes an erroneous exercise of discretion." *Id.*, ¶36.

¶22 V.S. argues on appeal that the circuit court erroneously exercised its discretion during the dispositional phase and improperly weighed the factors.[7] He points to the testimony given by his therapist and his mother and argues that their testimony shows that the factors enumerated in WIS. STAT. § 48.426(3) weigh in favor of denying the petition to terminate his parental rights to D.D.S. This court disagrees. The circuit court correctly listed each factor enumerated in WIS. STAT. § 48.426(3), and provided a reasoned explanation supporting its decision to terminate V.S.'s parental rights. *See David S. v. Laura S.*, 179 Wis. 2d 114, 150, 507 N.W.2d 94 (1993) ("The exercise of discretion requires a rational thought process based on examination of the facts and application of the relevant law.").

¶23 In making his argument, V.S. contends that the circuit court failed to place the proper weight on the testimony provided by V.S.'s therapist and mother and placed undue weight on the "Scared Straight" incident. However, "[a] determination of the best interests of the child in a termination proceeding depends on first-hand observation and experience with the persons involved and therefore is committed to the sound discretion of the circuit court." *Id.*

¶24 D.D.S.'s therapist, whose testimony is not even mentioned in V.S.'s briefing, but played an important role at the disposition, and D.D.S.'s case manager both testified about their recent and regular contacts with D.D.S., whereas the testimony introduced from both V.S.'s therapist and V.S.'s mother

---

[7] In lieu of filing a reply brief, V.S. filed a notice with this court that no reply brief would be filed. This court may take V.S.'s failure to file a reply and refute the arguments raised by the State and Guardian ad Litem as a concession and affirm on this basis. *See United Coop. v. Frontier FS Coop.*, 2007 WI App 197, ¶39, 304 Wis. 2d 750, 738 N.W.2d 578 (stating that the failure to refute a proposition asserted in a response brief may be taken as a concession). Nevertheless, for the sake of completeness, this court addresses the merits of V.S.'s argument.

demonstrated limited and irregular contact with D.D.S. In fact, the testimony at the dispositional hearing indicated that V.S.'s therapist had seen D.D.S. on only a handful of occasions and primarily relied on others to provide him with information about D.D.S., and it had been "a great deal of time" since V.S.'s mother had seen D.D.S. It was, therefore, not an erroneous exercise of the circuit court's discretion to consider this testimony as it did, particularly in light of the contradictory testimony from those who had regular and recent contact with D.D.S.

¶25 In addition, there is nothing in the record of the circuit court's decision supporting that it placed undue emphasis on the "Scared Straight" incident. The circuit court does not mention this incident during its findings and weighing of the factors in WIS. STAT. § 48.426(3). Instead, the circuit court aptly summarized the testimony that was put before it and explained how that testimony applied to each factor that it was required to consider in reaching a decision whether to terminate V.S.'s parental rights to D.D.S. Moreover, while it is true that D.D.S. did not display some of the extreme feelings towards V.S. that were described by D.D.S.'s therapist and case manager until after the "Scared Straight" incident, the fact remained that V.S.'s visits had been suspended before this incident due to allegations that V.S. hit D.D.S., V.S. had personal challenges that have always interfered with his ability to parent D.D.S., and by the time the circuit court rendered its decision here, it had been nearly a year since the incident and V.S. had not even taken steps to engage in the therapeutic visits with D.D.S. that were recommended for moving past the incident.

¶26 Last, this court recognizes that the paramount consideration at this phase of the proceeding is the best interests of the child. *Julie A.B.*, 255 Wis. 2d 170, ¶30. The testimony provided by V.S.'s therapist focused on V.S.'s efforts to

overcome his own challenges and the impact termination would have on V.S. This focus is misplaced and, therefore, the circuit court properly considered this testimony in light of the prevailing standard at this phase of the proceedings.

## CONCLUSION

¶27    In sum, this court concludes the circuit court did not erroneously exercise its discretion when it found that terminating V.S.'s parental rights was in D.D.S.'s best interests, and we affirm the circuit court's order terminating V.S.'s parental rights.

*By the Court.*—Order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.

13